UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KEVIN RAY PIRO, | CASE NO. 1:18-cv-00327-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| TEREMA CARLIN, DW MCKAY, LT. D. MARTINEZ, SERGEANT HOWARD, CM DRAKE, CM HALE, JUSTIN ARMSTRONG, BRUCE COOPER, RONA SIEGERT, JOSHUA TUCKET, MATT VALLEY, SAMUEL PIERSON, and JOHN DOE MEDICAL, | |
| Defendants. | |

**INTRODUCTION**

*Pro Se* Plaintiff, Kevin Ray Piro brings this § 1983 alleging deliberate

indifference in violation of the Eighth Amendment by Idaho Department of

Corrections staff and Corizon medical providers.[1] *Compl.* at 1, Dkt. 3. The Court

---

[1] Piro claims ICIO Warden Terema Carlin, ISCC Deputy Warden Timothy McKay, ISCC Lieutenant Dagoberto Martinez, IMSI Sargent Rob Howard, IMSI Case Manager Diana Drake, (Continued)

**MEMORANDUM DECISION AND ORDER - 1**

entered an Initial Review Order on February 13, 2019 allowing Piro to proceed on his claims. Dkt. 9. Piro has filed multiple motions related to discovery and access to legal services. *See* Dkts. 39, 40, 47, 52, 83, 86. Defendants moved for summary judgment.[2] Dkts. 51, 54. Briefing has been completed on all pending motions and they are ripe for consideration. For the reasons that follow the Court will deny Piro's motions and grant the Defendants'.

## BACKGROUND

Piro is an inmate in the custody of the Idaho Department of Corrections. On February 3, 2017 he was assaulted by another inmate. This assault forms the basis of his Eighth Amendment claims. Prior to the assault, Piro had repeatedly sought protective custody, and voiced concerns for his safety, because he believed he was at risk of harm for being a sex offender, and because the victim of his underlying rape conviction was related to local law enforcement.

### A.    Piro's Incarceration History

---

and IMSI Case Manager Nicholas Hale, failed to protect him. *Compl.*, Dkt. 3. The Court will refer to these defendants collectively as the "IDOC Defendants."

Piro claims Justin Armstrong, Bruce Cooper, Joshua Tuckett, Matt Valley, and Samuel Pierson were deliberately indifferent to his serious medical needs. *Compl.*, Dkt. 3. The Court will refer to these defendants collectively as the "Medical Defendants."

[2] Defendant Terema Carlin also filed a motion to dismiss or in the alternative summary judgment on April 15, 2019. Dkt. 25.

Piro was convicted of rape and burglary and incarcerated in October 2003. *See* Dkt. 25-3. Piro was initially housed at the Idaho State Correctional Institute (ISCI) where he was assaulted by gang members. *See Piro Depo* at 48-49, Dkt. 51-4. Piro alleges that he was threatened by several of the ISCI guards because his victim was the wife of a sheriff's deputy. *Id.* at 47. Following the assault, Piro received protective custody, and was transferred to Idaho Correctional Institute-Orofino (ICIO) in March 2004. *Id.* at 50-51; Dkt. 25-3 at 4. In November 2010, Piro checked out of protective custody because he was tired of the restrictions. *Piro Depo.* at 54-56, Dkt. 51-4. Piro remained at ICIO until July 6, 2016. *See* Dkt. 25-3.

On June 11, 2016, while at ICIO, Piro was in a fight with another inmate in which he bit the inmate's leg hard enough for the top layer of skin to peel away. *Carlin Dec.* ¶ 12, Dkt. 51-27; *Piro Depo.* at 66. Piro received a Class B Disciplinary Offense Report (DOR) for his role in the fight. *Carlin Dec.* ¶ 13. Following the fight Piro was reassigned from Unit A-1 to Unit A-2. *See Carlin Dec.* ¶ 17. Piro twice refused to move to Unit A-2 because he believed other inmates would harm him because he had been labelled a "snitch." [3] *Id.*; *Piro Depo.*

---

[3] Piro believes he had been labelled a snitch because inmates put religious oils on his personal bedding and he complained to prison staff. *Piro Depo.* at 56-58, 65.

at 66-68. Piro was never able to identify the inmates that were allegedly threatening him. *Piro Depo.* at 68. Piro received two Class C DORs for his refusal to move to Unit A-2. *Carlin Dec.* ¶ 17. The second DOR states that "Piro refused to move onto A2, he stated that there are too many people to name, but he is sure he is not safe on A2." *Carlin Dec. Ex. F*, Dkt. 51-33 at 2. Following his refusal to move to Unit A-2, Piro sent an offender concern form to Defendant Terema Carlin, the Warden at ICIO, stating that he would be in danger from "solids as I am labeled a snitch."[4] *Piro Depo. Ex. 5*, Dkt. 51-9.

Carlin has been the Warden at ICIO since 2008. *Carlin Dec.* ¶ 2. Carlin describes Piro as "an unusually difficult inmate to manage." *Id.* ¶ 10. While Piro was housed at ICIO he received 13 DORs, three for harassment, seven for disobedience to orders, and three for battery. *Id.* In June 2016, Carlin determined that Piro should be housed in a close custody facility due to his refusals to move to Unit A-2, his role in the June 11 fight—which Carlin believed should have resulted in a Class A DOR instead of a Class B DOR—and his behavior while at ICIO.[5] *Id.*

---

[4] Piro sent another concern from to Carlin the following day reiterating his concerns and venting. *Piro Depo.* at 79.

[5] IDOC classifies an inmate's custody level as either minimum, medium, or close depending on their crime, sentence, and incarceration history. *Carlin Dec.* ¶ 7. IDOC allows for a (Continued)

¶ 18. Piro was moved to close custody on June 28, 2016 and informed that he would be transported to an IDOC facility in Boise.[6] *Id.* ¶¶ 18-19.

Piro sent a concern form to Carlin on July 1, 2016 stating that he feared his life may still be in danger in Boise, and that he would feel forced to strike an officer to get put in Administrative Segregation. *Piro Depo. Ex. 8*, Dkt. 51-12. Carlin forwarded these concerns to the receiving facility. *See Carlin Depo.* ¶ 20. On July 1, Piro also sent a letter to his sister stating that "I cannot do that again because they would send me to ICC where I would get locked down 23 hours a day with a celly. I can't go through that again. I only have one chance now, I will have to hit a prison guard to get put in Ad seg." *Piro Depo. Ex. 4*, Dkt. 51-8. Piro describes this letter as "venting," because he knew he would be locked down 23 hours per day at ISCC and because he thought he would be in danger there. *Piro Depo.* at 69-72.

On July 2, 2016, Piro submitted a request for protective custody based on his

---

discretionary override of an inmate's calculated custody level based on classification staff's professional judgment. *Id.* ¶ 8.

[6] Carlin emailed ISCC Warden Randy Blades to notify him she was transferring Piro to close custody. *See Carlin Dec.* ¶ 18. Blades ultimately signed the override, however per IDOC policy Carlin should have signed it, Carlin describes this as administrative error. *Id.* Piro argues that this email and his reclassification to close custody demonstrates an effort by Carlin to harm him. *Piro Dec.* ¶ 23, Dkt. 66-2.

concern about IDOC officers harming him and the assault in 2003 at ISCI. *Piro Depo. Ex. 9*, Dkt. 51-13. In his protective custody request Piro identified an inmate at ICIO and stated that there "are gang members everywhere at IDOC" that may put him danger. *Id.* He also stated that IDOC staff may bribe gang member to attack him in revenge for his original crime. *Id.* Carlin had Piro's request forwarded to the Idaho State Correctional Center (ISCC), where Piro was being sent. *Carlin Dec.* ¶ 19. Carlin states that she did not believe that Piro was truly concerned for his safety, but was instead trying to manipulate his way out of moving to close custody. *Id.*

At the direction of Carlin, Corporal Wesley Heckathorn forwarded Piro's protective custody request to ISCC staff. In the email Heckathorn stated "I don't believe he really wanted PC, I think he was trying to thwart the move." *Piro Dec. Ex. L.*, Dkt. 66-4 at 2. Heckathorn further stated "[t]he main reason he is going to close custody is the threat toward staff" and cited Piro's letter to his sister. *Id.* As Piro points out, the letter to his sister was reviewed on July 1, and he was overridden to close custody on June 28. *Piro Dec.* ¶ 27, Dkt. 66-2. Piro describes Heckathorn's email as an attempt by Carlin to interfere with his protective custody request. *Id.*

Piro was transported to ISCC on July 6, 2016 and placed in segregation

pending an investigation. *See McKay Dec. Ex. C.*, Dkt. 51-37 at 3; *Piro Depo.* at 87. On July 10, 2016, Investigator Ditzion interviewed Piro regarding his protective custody request. *Piro Dec. Ex. 10*, Dkt. 51-14. During the interview Piro told Ditzion that he believed he couldn't live at ISCC because of various Security Threat Groups (STG) and feeling as though staff would use gang members to get him, or come after him directly, due to the victim of his rape. *Id.* Piro stated the only place he would feel safe was in protective custody at ICIO or in administrative segregation. *Id.* Piro was unable to provide any specific information regarding threats from STGs at ISCC. *Id.* Due to the lack of evidence regarding specific threats Ditzion did not recommend protective custody. *McKay Dec. Ex. C.*, Dkt. 51-37 at 1.

The Restrictive Housing Placement Committee (RHPC) held a hearing on Piro's protective custody request on July 14, 2016.[7] The RHPC is a three person committee that interviews the inmate and considers various factors, including the inmate's institutional record, criminal record, attitude towards authority, and willingness and ability to live with other offenders. *McKay Dec.* ¶ 8. Each RHPC

---

[7] The RHPC tries to ensure the safety of inmates who need protective custody while screening out inmates who are trying to manipulate their way into specific housing. *McKay Dec.* ¶ 11. One of the indicators of manipulation the RHPC considers is a lack of a specific threat to the inmate. *Id.*

member makes a recommendation whether to grant or deny the protective custody request to the Warden, who has final authority to approve or deny the request. *Id.*

At the July 14 hearing Piro stated that he believed he was not safe at ISCC. *McKay Dec. Ex. D.*, Dkt. 51-38. Piro stated that he was worried about what staff would do to him because his victim was involved with the judicial system. *Id.* However, the RHPC considered that his crime was committed 16 years earlier and Piro did not identify any specific threats by staff or offenders. *Id.* Piro states that the record of the hearing is not accurate, that he told the RHPC that he was worried that gang members would attack him because he is a sex offender and that there were certain, although unidentified, staff members who would cause him to be attacked. *Piro Depo.* at 100.

Following the hearing, the RHPC recommended that Piro be placed in the general population. *McKay Dec. Ex. D.*, Dkt. 51-38. Defendant McKay, who was the chair of the RHPC, states that he believed Piro was trying to manipulate his way back to ICIO and was not at a substantial risk of serious harm if he was housed in the general population. *Id.* ¶ 11.

Following the RHPC hearing, Piro repeatedly refused to move to the general population at ISCC. He received five DORs between July 20, 2016 and August 29, 2016 for refusing to house. *McKay Dec. Ex. E.*, 51-39. Piro appealed the sanction

for the July 20 DOR, which was a restriction of property for 60 days. *Id.* In the appeal Piro stated that he had refused to move "because I was told by staff that I would be locked down with a celly 23 hours a day. In pc Orofino I was locked down with a celly for 7 years, it tramsatized me, if I had not checked out of pc at that time I would have committed suiside." *Id.* Piro made no reference to concerns about threats, but instead protested that the punishment was too harsh. *Id.*

On September 1, 2016, Defendant Lt. Dagoberto Martinez ordered Piro to move from segregation to Unit DEF. *Martinez Dec.* ¶¶ 2-3, Dkt. 51-40. Piro refused and states that he told Martinez that he feared for his life because IDOC officers in the past had threatened him and were going to get gang members to beat him up, and also because he was a sex offender. *Piro Depo.* at 101-02. Martinez informed Piro that failure to obey would result in the use of force. *Martinez Dec.* ¶ 5. Martinez gave orders for the planned use of force, but when the extraction team arrived Piro did not resist. *Piro Depo.* at 105-06; *Piro Dec. Ex. R.*, Dkt. 66-4 at 24. Martinez was not on the extraction team and had no further contact with Piro. *Martinez Dec.* ¶ 7. Martinez states that he believed Piro refused to move because he was comfortable in segregation without a cellmate. *Id.* ¶ 6.

### B.    Piro's Incarceration at IMSI and the Assault

On September 1, 2016, Piro was transported to Idaho Maximum Security

Institution (IMSI) and placed in segregation until September 10, 2016, when he was moved to Tier A-2. Dkt. 25-3 at 2. Tier A-2 was managed as a "softer" tier that generally housed inmates who were less likely to be violent or problematic. *Howard Dec.* ¶ 5. Tier A-2 housed inmates who might be assaulted or extorted on another tier with more STG activity. *Id.* These included sex offenders, gang dropouts, and inmates who had previously been threatened. *Id.* Between February 3, 2016 and February 3, 2017, 44 individual sex offenders were housed on Tier A-2 at various times. *Tomlinson Dec.* ¶ 6, Dkt. 51-44. During the same time period two sex offenders, in addition to Piro, were assaulted on Tier A-2. *Pappas Dec. Ex. A.*, Dkt. 51-47.

When Piro was moved to Tier A-2 he met with Defendant Sergeant Rob Howard[8] and expressed his concerns about past threats from IDOC officers, his previous attack, and his sex offender status. *Piro Depo.* at 109. Howard told Piro that there were other inmates on Tier A-2 with the same concerns as Piro and to tell him if Piro saw any gang politics. *Id.* Piro did not request protective custody at

---

[8] At the time Piro met with Sgt. Howard he was the Investigations Sergeant with oversight of investigations. *Howard Dec.* ¶ 3, Dkt. 51-42. In that role Sgt. Howard was responsible for conducting investigations to protect staff and offenders and monitoring STG activity and members. *Id.* In October 2016, Sgt. Howard became the Unit Supervisor for A Block at IMSI and was responsible for supervising staff and reviewing offender concerns. *Id.* ¶ 4.

that time. *Howard Dec.* ¶ 6, Dkt. 51-42. From the time Piro moved to Tier A-2 in

September 2016 to February 3, 2017 he did not express any other concerns for his

safety to IMSI staff.[9] *Piro Depo.* at 110-11; *Drake Dec.* ¶ 7, Dkt. 51-50. Piro states

that he didn't feel that protective custody was available to him after it was denied

at ISCC, however no one told him that he could not request protective custody at

IMSI. *Id.* at 114.

Sometime prior to February 3, 2017, Piro placed a concern form requesting

an exception to move to E and G block, which is a worker's unit. *Piro Depo.* at

116-17. Piro wanted to move to E and G Block because he had heard it was safer

than Tier A-2. *Id.* at 118. Piro states that he did not receive any threats until

February 2017 when he put in a concern form requesting to move to E and G

Block. *Id.* at 111.

On the morning of February 3, 2017, Piro met with Defendant Nicholas

Hale, the case manager for E and G Block, to address Piro's requested move. *Id.* at

---

[9] Piro met with his Case Manager, Defendant Diana Drake, on September 23, 2016. The C-Note recorded by Drake indicates that Piro told Drake that he didn't realize how good he had it at ICIO and that he would like to try to go back there after some time without DORs. *Piro Depo. Ex. 13*, Dkt. 51-17 at 1-2. Piro states that he told Drake about his concerns of being attacked because of his victim and because he was a sex offender. *Piro Depo.* at 113-14. The main concern he expressed was that gang members might beat him up because he was a sex offender. *Id.*

**MEMORANDUM DECISION AND ORDER - 11**

120; *Hale Dec.* ¶¶ 3, 6, Dkt. 51-52. Defendant Diana Drake, Piro's case manager, brought Piro to the meeting and sat in on it. *Piro Depo.* at 120; *Drake Dec.* ¶ 8, Dkt. 51-50. At the meeting Hale reviewed Piro's DOR history, asked him why he wanted to work in E and G Block, and explained how the units functioned and the type of inmates housed there. *Hale Dec.* ¶ 6. Hale also asked Piro how he would feel as a sex offender working with inmates who had dropped out of gangs. *Id.*; *Piro Depo.* at 120. Piro describes his exchange with Hale as follows:

> I said, I don't believe they're truly dropouts. I said, I'm living on a tier right now with so-called gang dropouts, and I'm getting threats that I'm going to get attacked and smashed out right now. And [Hale] says, well, you're safer than you would be on the street. I said, no, I'm in a lot more danger than I would be on the street. [Hale] says, well, Mr. Piro, you're not in any more danger of getting attacked than I am working in a prison, and I said yes, I am.

*Piro Depo.* at 120-21.

Drake and Hale both state that they did not believe Piro was communicating that there was a specific danger to his safety. *Drake Dec.* ¶ 8; *Hale Dec.* ¶ 7. They both state that they interpreted Piro's concerns as general concerns expressed due to his status as a sex offender. *Id.* Hale states that he did not ask any follow-up questions about his statement because he did not understand that Piro was currently

receiving threats.[10] *Hale Dec.* ¶ 6. Instead, Hale states that he believed Piro to be trying to justify being moved to E and G Block. *Id.* ¶ 7. Drake states that if she had understood that Piro was telling her about an immediate threat she would have held him in the office and called a sergeant. *Drake Dec.* ¶ 9. Piro states that he gave Drake and Hale enough information that they knew the risk of harm existed. *Piro Depo.* at 134-35.

Following the meeting Drake took Piro back to Tier A-2. *Id.* at 121; *Drake Dec.* ¶ 10. Piro did not resist returning to Tier A-2. *Drake Dec.* ¶ 10. Drake states that if Piro had resisted returning to the Tier she and Hale would have honored that request and initiated the protective custody process. *Id.*

Prior to the February 3 meeting, Piro had heard inmates talking through the vents saying that Piro was going to get "smashed out."[11] *Piro Depo.* at 122.

---

[10] Hale also states that, due to his role on the RHPC, he was alert for potential protective custody issues. *Hale Dec.* ¶ 8. Hale further states that if he had understood Piro to be expressing a concern about a current imminent and specific danger Hale would have asked follow-up questions to identify the specific threat and started the protective custody process. *Id.*

[11] Piro describes the threats he heard through the vents as follows:

Well, they were trying to be a little bit confusing. For a little while, they were talking about Piro's cellie's going to get smashed out, you know, and somebody else says, well, how about Piro; isn't Piro going to get smashed out? Yeah, yeah, Piro is going to get smashed out. You know, and it kind of like -- they would play it like that.

*Piro Depo.* at 122.

However, Piro did not tell Drake or Hale about these specific threats. *Id.* at 123. Piro could not identify the inmates making the threats he was hearing through the vents. *Id.* at 122.

Shortly after returning to Tier A-2, at about 10:45 a.m., Piro was assaulted by inmate Chadwick Pasquini. *Piro Depo.* at 124; *Piro Dec. Ex. CC*, Dkt. 66-6 at 11. The assault resulted in fractures to Piro's facial bones, and a laceration to Piro's left ear. *See Medical Records*, Dkt. 54-4 at 51, 66. Pasquini moved onto Tier A-2 the day before the assault. *Howard Dec.* ¶ 9. Piro had not interacted with Pasquini prior to the assault. *Piro Depo.* at 128. Piro believes that Pasquini assaulted him because he was attempting to join the Severely Violent Criminals (SVC) and needed to "put in work" by attacking sex offender. *Piro Depo.* at 129-31; *Piro Dec.* ¶¶ 53-55.

Pasquini's assault on Piro was his first known act of violence in prison. *See Novotny Dec.* ¶ 7, Dkt. 51-48. When Pasquini was moved to IMSI, IDOC staff reviewed his file, he had two DORs for possession of alcohol/drugs and one DOR for failure to comply with a disciplinary sanction. *Id.* IDOC staff describe his correction contact notes as benign. *Id.* Further, IDOC had no record that Pasquini was suspected of being affiliated with any STGs. *Id.* ¶¶ 6-7; *Howard Dec.* ¶ 9. Pasquini was eventually identified as an STG affiliate in December 2017, when

IDOC staff discovered he had a "SVC" tattoo. *See Piro Dec. Ex. T*, Dkt. 66-4 at 31; *Novotny Dec.* ¶ 9, Dkt. 7.

The day before the assault, Piro's cellmate had sent a JPAY message to his mother telling his mother that he believed there was an active gang member on his walk and that either he or his cellmate (Piro) would be assaulted. *Piro Depo.* at 131-33; *Piro Dec. Ex. CC.*, Dkt. 66-6 at 11. Piro's cellmate's mother left a voicemail for Drake at approximately 8:00 p.m. the evening of February 2, 2017 telling Drake about the message. *Piro Depo.* at 131-33; *Piro Dec. Ex. CC.*, Dkt. 66-6 at 11. Drake listened to the message on February 3, 2017 at 1:50 p.m., after the assault on Piro had occurred, and filed an information report. *Piro Dec. Ex. CC.*, Dkt. 66-6 at 11. Piro asserts that all JPAY messages are flagged and screened when they are sent, so IDOC staff should have been aware of the contents of the message prior to his assault. *Piro Depo.* at 132. However, there is no evidence in the record, beyond Piro's assertion, that anyone at IDOC was aware of the message before Drake listened to the voicemail on the afternoon of February 3.[12]

---

[12] Piro also submits two information reports which he contends show Drake knew of the threat to him. *Piro Dec. Ex. AA, Ex. BB*, Dkt. 66-6 at 5, 8. The first information report relates to a conversation Drake had with an inmate regarding a possible attack on an "old man." *Piro Dec. Ex. AA*, Dkt. 66-6 at 5. The report states that the inmate spoke to the potential assailant and they were "able to work it out pro-socially." *Id.* The second report relates to a conversation Drake had (Continued)

### C.      Piro's Medical Care

Following the assault by Pasquini, Piro was examined by Defendant Justin Armstrong, a nurse for Corizon. *Armstrong Dec.* ¶¶ 3, 6, Dkt. 54-7; *Medical Records*, Dkt. 54-4 at 51-52. Armstrong determined that Piro had a small laceration on his left ear and a small hematoma under his left eye. *Armstrong Dec.* ¶ 6. Armstrong examined Piro's eyes and ears and concluded he was not suffering from any disturbances. *Id.* Armstrong examined Piro's jaw and did not feel any deformities, contusions, abrasions, or punctures. *Id.* Armstrong also examined Piro's back and spine and concluded there was no swelling or tenderness. *Id.* Armstrong administered gauze and bacitracin for the wound on Piro's ear and submitted an ice memorandum. *Id.* ¶ 7.

Throughout the day of February 3, Piro submitted three Health Service Request (HSR) forms stating that he needed an x-ray of his back, needed stiches for his ear, and that he needed something for pain. Dkt. 54-4 at 49. Piro was again seen by Armstrong the evening of February 3. *Id.* ¶ 8. Armtrong told Piro to submit

───────────────────

with an inmate on February 3, where the inmate reported that there were "still like 4 active gang members that are probably going to take off on people when the dayroom opened." *Piro Dec. Ex. BB*, Dkt. 66-6 at 8. In the report Drake states that she is "unsure of the validity" of the statement, but thought it was important to report due to the two recent assaults on Tier A-2. *Id.* This report was entered at 1:05 p.m., after Piro was assaulted. It is unclear from the report what time Drake's conversation with the inmate occurred.

a Health Service Request (HSR) form if his vision changed or the pain in his jaw increased. *Id.*

Armstrong states that he gave Piro pain medication and submitted a Keep on Person order for Tylenol. *Id.* Piro states that he was not given pain medication on February 3. *Piro Dec.* ¶ 6, Dkt. 71-1. Piro further asserts that he was never given pain medication between February 3 and February 22,[13] and that he never refused pain medication.[14] *Pl.'s Statement of Disputed Facts* ¶¶ 5, 7. However, the medical records show that Piro was prescribed pain medication and repeatedly refused the pain medication. The medical record for February 3 shows that Piro had a keep on person order for Tylenol. Dkt. 54-4 at 50. On February 6, Piro was given one box of acetaminophen and one box of ibuprofen with a keep on person order. *Id.* at 49-50. The medical records contain multiple refusal of clinical service forms where Piro refused Tylenol between February 4 and February 6. *Id.* at 59-63. On February 9, Defendant Matt Valley prescribed Piro ibuprofen for 30 days. *Id.* at 48.

_____

[13] Piro argues that even though he was prescribed pain medication, Corizon staff never actually gave it to him. This assertion is refuted by Piro's own evidence showing that he had a prescription for APAP (Tylenol) beginning on December 28, 2016 continuing through March 27, 2017, and that he had a prescription for Ibuprofen beginning on February 9, 2017 continuing through March 10, 2017, both of which were received from the pharmacy. *Pl.'s Ex. E*, Dkt. 71-2 at 16-18.

[14] Piro states that he did refuse lisinopril, which is a blood pressure medication, but asserts that he never refused Tylenol or other pain medication.

**MEMORANDUM DECISION AND ORDER - 17**

The medical records further show that between February 7 and 15, Piro was visited by Corizon staff, including Armstrong, while they were on segregation rounds and Piro denied that he had any complaints. Dkt. 54-4 at 48-49.

On February 5, Piro submitted an HSR requesting an x-ray of his back. On February 6, Piro was examined by Defendant Bruce Cooper, a Corizon medical specialist. *Cooper Dec.* ¶ 6, 54-11. In response to Piro's concern about his back Cooper determined that Piro could squat but rose very slowly. *Id.* Cooper also noticed a lump on the left side of Piro's face, which was bruised and tender to the touch. *Id.* Cooper gave Piro pain medication and scheduled him to be seen by a practitioner. *Id.*

On February 9, Piro was examined and treated by Defendant Matt Valley, a physician assistant with Corizon. *Valley Dec.* ¶ 6, Dkt. 54-10. Piro informed Valley he believed his cheek was broken. *See id.* Valley determined that Piro had a small bruise under his left eye but the extraocular muscle was intact. *Id.* Valley did not observe any obvious facial fractures. *Id.* Valley did order an x-ray of Piro's face and prescribed ibuprofen. *Id.* The x-ray was taken on February 10 and Piro had a follow-up appointment with Valley to review the x-ray on February 16. *Id.* ¶ 10; *Johnson Dec.*, Dkt. 73-1 at 2. Upon reviewing the x-ray, Valley diagnosed Piro with a fracture of the left inferior orbital rim, of the zygomaticofrontal bone and

the left zygomatic arch. *Id.* Valley referred Piro to an offsite surgeon. *Id.*

On February 21 Piro was examined by offsite provider, Dr. Cole Anderson. Dr. Anderson concluded Piro had a left zygomatic/orbital tripod fracture. Dkt. 54-4 at 64-65. On February 22 Dr. Anderson operated on Piro to correct the fracture. *Id.* 66-68. Dr. Anderson noted that there was some challenge luxating and reducing the fracture due to the age of the fracture. *Id.* Piro was released from the hospital the same day and ordered to continue taking Tylenol and ibuprofen. *Id.* at 47.

On February 23 Piro submitted three HSRs stating that he needed an x-ray of his back and further evaluation of his eye and ear, that he needed something for pain, and that he did not receive proper medical care because his ear was not properly cleaned and that he needed stiches. Dkt. 54-4 at 6-8. On the afternoon of February 23, Piro had a follow-up appointment with Valley. The medical records show that Piro told Valley that his "only problem is severe acid reflux" but that he didn't have any concerns related to the surgery and that his pain was well controlled. *Id.* at 47. Valley gave Piro tums, discontinued the ibuprofen, and said he could continue with Tylenol as needed. *Id.*

On February 25 and 26 Piro refused pain medication because he wanted to see where his pain was without medication. Dkt. 54-4 at 55-58. On February 26 and 27, Piro submitted HSRs requesting Tylenol. *Id.* at 9-10.

**MEMORANDUM DECISION AND ORDER - 19**

On February 28, Piro submitted an HSR stating that there was irritation of his left eye and that it was sitting back in the eye socket as a result of the surgery. Dkt. 54-4 at 11. On March 13, 2017, Piro had a post-operative follow-up visit with Dr. Anderson. *Id.* at 72. Piro told Dr. Anderson about his concerns regarding his eye. *Id.* Dr. Anderson found that Piro was healing without apparent complications and ordered that he come back in three months. *Id.*

On April 6 Piro submitted an HSR stating that he had a "broken bone bump" in his eye socket and that it was not corrected during surgery. Dkt. 54-4 at 15. On April 10, Piro had an appointment with Valley regarding the concerns raised in his HSR. *Id.* at 45. According to the medical records Piro told Valley that he was suspicious that, because he is an inmate, the surgeon did not take good care of him and is conspiring with IDOC staff to purposefully botch his surgery. *Id.* Valley reassured Piro that he did not believe there was a conspiracy against him and that Piro could have some lasting "bumps" due to the injuries he sustained. *Id.*

On May 18, Piro had his final post-operative follow-up with Dr. Anderson. *See* Dkt 54-4 at 40. Dr. Anderson concluded Piro was healing well and that no further follow-up or treatment was necessary. *Id.* On May 30, Piro had an appointment with Valley, where Valley discussed Dr. Anderson's notes with Piro. *Id.* On June 18, Piro submitted an HSR asking to have his Tylenol discontinued

because he didn't need it. *Id.* at 16.

On September 3 and 15, Piro submitted HSRs stating that his surgery was botched, that his eye socket was not repaired, and that a bone was sticking out under the skin. *Id.* at 17-18. On September 16, Piro had an appointment with LPN Effie Reed-Rodriguez who examined Piro and told him that the "slight knot" under the skin may be a screw which may be felt because the skin is very thin. *Id.* at 39. The medical records show that Piro stated that he understood. *Id.* Reed-Rodriguez explained that the nerve damage may take up to a year to heal. *Id.* Piro stated that because he is a prisoner he was not getting treated fairly and insisted on a new surgery. *Id.*

On September 27, Piro had a follow-up appointment with Physician Assistant Collin Brown. *Id.* at 38-39. Brown examined Piro and reviewed his medical records. *Id.* Brown explained Dr. Anderson's notes and explained that the surgery was successful and without significant complications. Brown also advised Piro that another facial surgery or "re-breaking" the fracture was not in Piro's best interest, instead Brown told Piro that risks of repeat surgery far outweigh benefits. *Id.* Brown discussed pain management with Piro and prescribed Tylenol. *Id.*

On March 16, 2018 Piro submitted an HSR again stating that the earlier surgery did not repair his broken eye socket and facial bone and that he was still

suffering pain. *Id.* at 19. Piro had another appointment with Brown on March 28, 2018 to address the concerns in his HSR. *Id.* at 37. Brown advised Piro that Dr. Anderson did not recommend another surgery and that another surgery would not be appropriate so late after the initial surgery. Piro was very aggressive and hostile, demanding to see Dr. Anderson and threatening to sue Brown. *Id.* Brown tried to address Piro's pain regiment for 30 minutes and offered to have Piro speak with a Corizon doctor, however Piro refused. *Id.* Brown ordered an x-ray to determine if there were any problems with hardware placement or abnormalities. *Id.* The x-ray was conducted on April 3, 2018 and the doctor who reviewed it stated that there was an old plate and screw fixation of the left orbit, but the facial bones were otherwise unremarkable. *Id.* at 53.

## LEGAL STANDARD

### A.   Motion to Compel

Federal Rule of Civil Procedure 26(b) provides that:

> "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

Fed. R. Civ. P. 26(b)(1).

Pursuant to Rule 37, a party seeking discovery may move for an order

compelling production by a party who has failed to answer an interrogatory or produce requested documents. Fed. R. Civ. P. 37(a)(3). While the moving party must make a threshold showing of relevance, *see, e.g., Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.,* 981 F.2d 429, 438-39 (9th Cir. 1992), the party resisting discovery carries has the burden of showing specifically why the discovery request is irrelevant, unduly burdensome, disproportional to the needs of the case, or otherwise improper. *See Superior Commc'ns v. Earhugger, Inc.,* 257 F.R.D. 215, 217 (C.D. Cal. 2009).

"A motion to compel may be filed after the close of discovery." *Gault v. Nabisco Biscuit Co.*, 184 F.R.D. 620, 622 (D. Nev. 1999). However, "[a]bsent unusual circumstances, it should be filed before the scheduled date for dispositive motions." *Id.*

### B.    Motion for Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal

tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th

Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## C.    Eighth Amendment

The Eighth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment,

prisoners must show that they are "incarcerated under conditions posing a substantial risk of serious harm," or that they have been deprived of "the minimal civilized measure of life's necessities" as a result of the defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds by *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

### 1.  Failure to Protect

To prevail on an Eighth Amendment failure-to-protect claim, an inmate must satisfy both parts of a two-pronged test. *Farmer*, 511 U.S. at 834. First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. The risk alleged must be "objectively, sufficiently serious." *Id*. (citations and punctuation omitted). Here, the Parties do not dispute that the assault on Piro satisfies this element.

Second, the prison officials must have acted with deliberate indifference to prisoner health or safety. *Id*. "Deliberate indifference" is a higher standard than negligence and requires that "the official knows of and disregards an excessive risk

to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. A prison official may know of a substantial risk "from the very fact that the risk was obvious." *Id*. at 840. However, prison officials are not liable if 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" *Id*. at 844.

The fact-finder may infer subjective awareness from circumstantial evidence. *Id*. at 842. However, the Ninth Circuit has explained that the Eighth Amendment requires more than a "mere threat" of possible harm. *See Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) ("The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur."). Instead, the prisoner must alert prison officials to a relatively specific threat of harm. *See Williams v. Wood*, 223 F. App'x 670, 671 (9th Cir.2007) ("[S]peculative and generalized fears of harm at the hands of other prisoners do not rise to a sufficiently substantial risk of serious harm to [plaintiff's] future health."); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir.1987)

(holding that a "mere naked threat" cannot constitute an Eighth Amendment violation and that it "trivializes the eighth amendment to believe that a threat constitutes a constitutional wrong"). The prisoner may also demonstrate that the risk was obvious either due to the prisoner's characteristics or conditions within the prison. *See Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013) ("[O]bviousness is not measured by what is obvious to a layman, but rather by what would be obvious in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved." (citations omitted)).

Finally, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' not absolute safety." *Savocchio v. Crabtree*, No. CV-97-1698-ST, 1999 WL 562692, at *5 (D. Or. July 12, 1999) (quoting *Farmer*, 511 U.S. at 844).

### 2.  Medical Care

The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate

indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ....

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, "deliberate indifference entails something more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. A prison official or prison medical provider acts

with "deliberate indifference ... only if the [prison official or provider] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (internal quotation marks omitted), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

"If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188. However, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) ("[D]eliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm.").

In the medical context, a conclusion that a defendant acted with deliberate indifference requires that the plaintiff show "a purposeful act or failure to respond to a prisoner's pain or possible medical need and ... harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). A delay in treatment does not violate the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060. If medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061.

The Eighth Amendment does not provide a right to a specific treatment, *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997), and differences in judgment

between an inmate and prison medical providers regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim, *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *see also Lamb v. Norwood*, 895 F.3d 756, 760 (10th Cir. 2018) ("[P]rison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants."). To state an Eighth Amendment claim "involving choices between alternative courses of treatment," the plaintiff must plausibly allege "that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Stated another way, a plaintiff must plausibly allege that medical providers chose one treatment over the plaintiff's preferred treatment "even though they knew [plaintiff's preferred treatment] to be medically necessary based on [the plaintiff's] records and prevailing medical standards." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1117 (N.D. Cal. 2015). A prison doctor's judgment in choosing one treatment over another—even if the chosen treatment happens to be less expensive and, therefore, more profitable to the entity

providing that treatment—does not constitute deliberate indifference unless the recommendation "was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998); *see also Zingg v. Thomas Groblewski & Mass. P'ship for Corr. Healthcare*, 907 F.3d 630, 638 (1st Cir. Oct. 29, 2018) (holding that there is no "per se Eighth Amendment prohibition against corrections officials considering cost, even when considered only in the course of selecting treatment that is aimed at attending to an incarcerated person's serious medical needs").

## ANALYSIS

### A.     Motions to Compel

#### 1.  October 16, 2019 Motion to Compel

On October 16, 2019 Piro filed a motion to compel discovery from the IDOC defendants and from Defendant Joshua Tuckett.[15] Dkt. 40. In his motion Piro appears to seek from IDOC records related to his 2004 protective custody request, various video recordings of his protective custody hearings, and

---

[15] Piro also filed a Motion for Leave to Move for an Order to Compel Discovery (Dkt. 39). Because the Court ruled on Piro's Motion to Compel the above motion is moot.

information used in his 2016 protective custody hearing, the full recording of him being returned to Tier-A2 prior to the attack, and information about his assailant. *Piro Dec.*, Dkt. 40-1. He also seeks to compel Joshua Tuckett, or the medical defendants, to provide a cat-scan of his face. *Id.*

### a. IDOC Defendants

On September 16, 2019 Piro sent a letter to the IDOC defendants notifying them of his perceived deficiencies in their discovery responses. *Piro Dec. Ex. B.*, Dkt. 40-3. Piro told the IDOC defendants that if they did not respond within 14 days he would file a motion to compel. This letter primarily related to records of his protective custody requests and hearings and did not address many of the perceived deficiencies raised in his motion. *Id.* On October 22, 2019, after his motion was filed, Piro sent another letter to IDOC defendants notifying them of his intent to file a motion to compel if they did not produce some of the information covered by his previous letter, and some information addressed in his motion to compel. *Larrondo Dec. Ex. B.*, Dkt. 42-3.

In his motion, Piro stated that "[t]he end date for completing discovery is sometime in November-2019, therefore, Plaintiff believes he does not have time for a back and forth dispute with defendants…" *Mot.* at 2, Dkt. 40. At Piro's deposition on October 28, 2019, Megan Larrondo, counsel for IDOC, discussed

Piro's motion to compel with him. *Piro Depo.* at 6-7, Dkt. 51-4. Ms. Larrondo

agreed to provide the requested protective custody records from 2004 and 2005. *Id.*

Piro agreed to withdraw paragraphs 15, 16, 17, and 18. *Id.* at 7-8.

It appears that the only remaining issues in Piro's motion to compel are two

requests for production directed to Defendant McKay.[16] *See Piro Dec.* ¶¶ 13-14,

Dkt. 40-1 at 5-6. In Piro's Request for Production No. 1 he seeks all video and

audio recordings of the July 14, 2016 RHPC hearing. *Piro Dec. Ex. C*, Dkt. 40-4.

McKay responded that he does not possess any recordings because IDOC does not

record RHPC hearings. *Id*. In Request for Production No. 2 Piro requested all

IDOC rules, regulations and policy requirements that McKay relied on to

disqualify Piro from being placed in protective custody. *Id.* In his motion Piro

expanded his request—moving to compel all information McKay relied on, not just

policies and regulations. *Piro Dec.* ¶ 14, Dkt. 40-1. McKay responded to Request

for Production No. 2 by providing all responsive records. *See Resp.* at 15, Dkt. 42.

Piro failed to meet and confer with Defendants, and for this reason his

motion to compel would be denied. *See Discovery Order* at 3, Dkt. 10 (advising

the parties of the meet and confer requirements under Fed. R. Civ. P. 37(a)(1));

---

[16] Piro did not address the IDOC Defendant's arguments in his reply, instead he solely
focused on obtaining a cat-scan of his face. *Rep.*, Dkt. 46.

*Castillon v. Corr. Corp. of Am.*, 2014 WL 4365317, at *3 (D. Idaho Sept. 2, 2014). Most of the issues in Piro's motion have been rendered moot, however the Court will also deny the motion on the merits as to the two remaining requests. No recordings exist of the July 2014, 2016 hearing; therefore, none can be produced. McKay fully responded to Piro's Request for Production No. 2 as actually written. Piro cannot use his motion to compel to seek information he did not previously request from the defendants.

### b.  Joshua Tuckett

Piro's Request for Production No. 3 to Defendant Tuckett requested that Piro be taken to a hospital, given a CT scan of his facial fracture, and have the result of the CT scan produced. *See Osler Dec. Ex. B.*, Dkt. 41-3 at 3-4. Tuckett, and Corizon, objected and responded that this was not a proper request for production and that Piro should request the CT scan through the proper prison channels. *Id.* at 4. Piro asserts that the prison x-ray does not show an alleged boney protrusion, which is causing him pain, and a more detailed cat-scan is needed to refute the x-ray. *Piro Dec.* ¶ 20, Dkt. 40-1 at 10. Piro argues a CT scan is necessary to refute Defendants' evidence that the delay in obtaining surgery was medically appropriate. *See id.*

Piro did not contact Tuckett regarding Piro's perceived deficiencies in

Tuckett's response until after the motion to compel was filed. *See Osler Dec.* ¶ 5

Dkt. 41-1. Piro did not submit an HSR requesting a CT scan through the prison

until October 30, 2019. *Id.* ¶ 10.

As discussed above, Piro's motion would be denied because he failed to

comply with the requirement to meet and confer. Piro's motion will also be denied

because Tuckett was no longer employed with Corizon at the time of Piro's request

and had no authority to order a CT scan. Further, Piro's request to have the medical

defendants order a CT scan is not a proper request for production under Rule 34.

*See* Fed. R. Civ. P. 34(a). Finally, even if a CT scan would tend to show a more

detailed view of Piro's now healed facial fracture it would not show that

Defendants were deliberately indifferent and would not be proportional under Rule

26. Accordingly, Piro's motion to compel will be denied.

### 2.  February 7, 2020 Motion to Reopen Discovery

On February 7, 2020, Piro filed a motion to reopen discovery or in the

alternative to compel discovery (Dkt. 83).[17] Piro seeks to reopen discovery related

_____

[17] Piro also filed a Motion for the Court to Take Notice of Plaintiff's Deposition
Testimony, which was filed by Defendants in support of their motions for summary judgment.
Dkt. 86. This motion will be denied to the extent that it seeks to improperly supplement Piro's
response to Defendants motions for summary judgment. However, the Court has carefully
considered Piro's deposition testimony in deciding the motions for summary judgment.

to IDOC's or Corizon's policies for providing "Keep on Person" medication to inmates who are housed in segregation. *Id.* at 2.

The Court ordered that all discovery be completed by November 8, 2019 (Dkt. 10), and that any motions for summary judgment be filed by December 10, 2019 (Dkt. 9). Piro filed his motion to reopen discovery three months after discovery closed, two months after the dispositive motion deadline, and two weeks after briefing on the motions for summary judgment was complete.

Piro never sought information regarding "Keep on Person" medication during the discovery period. *See Resp.* at 5, Dkt. 84. Piro puts forward no reason why he did not seek this information until two months after the dispositive motion deadline. *See* Dkt. 83 Accordingly, the motion will be denied.[18] *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002).

### B.     Motion to Appoint Counsel and Medical Expert

On November 22, 2019 Piro filed a Motion for Appointment of Counsel and

---

[18] As support for his motion Piro submitted an Inmate Concern Form regarding IDOC's policies regarding KOP medication while an inmate is in segregation. Piro also submitted this same form (Dkt. 81) as supplemental evidence in opposition to Defendants' motion for summary judgment. The form was addressed to ISCC staff, instead of IMSI staff, it is not clear who signed the form, it was filed after Defendants filed their reply, and the form lacks any evidentiary foundation. Accordingly, the Court will not consider this evidence in deciding the motions for summary judgment.

Medical Expert Witness.[19] Dkt. 47. Piro argues that his lack of education, the complexity of this case, and his injuries warrant appointing counsel and a medical expert. *Id.* Defendants object to this motion. Dkt. 57, 58. The Court denied Piro's prior motion for appointment of counsel without prejudice. Dkt. 9.

### 1.  Appointment of Counsel

There is no constitutional right to counsel in a § 1983 action. *Rand v. Rowland*, 113 F.3d 1520, 1525 (9th Cir. 1997), *withdrawn in part*, 154 F.3d 952, 954 n.1 (9th Cir. 1998); *See also Lassiter v. Dept. of Social Services*, 452 U.S. 18, 25 (1981) (holding that prisoners and indigents in civil actions have no constitutional right to counsel unless their physical liberty is at stake). A district court may request an attorney for indigent civil litigants pursuant to 28 U.S.C. § 1915(e)(1) in exceptional circumstances. *See United States v. 30.64 Acres of Land*, 795 F.2d 796, 799-801 (9th Cir. 1986); *Wilborn v. Escalderon*, 789 F.2d 1328, 1330-1331 (9th Cir. 1986) (holding that the decision to appoint counsel for

---

[19] Piro also submitted a request for e-filing rules and procedures. Dkt. 52. Piro has taken issue with the prison paralegal's handling of his documents throughout this case, and requests e-filing information because he does not believe the paralegal is handling his documents correctly. The Court has carefully reviewed Piro's voluminous pleadings and exhibits and has not been able to identify any files that appear to be missing. Further, Defendants identified the relevant orders, procedures, and policies, in their response, all of which are publicly available. Accordingly, to the extent that this request may be construed as a motion, it will be denied as moot.

indigent litigants is within the court's discretion and counsel should be appointed in "extraordinary cases"). To determine whether exceptional circumstances exist, the court evaluates both "the likelihood of success on the merits [and] the ability of the petitioner to articulate his claims pro se in light of the complexity of the legal issues involved" *Wilborn*, 789 F.2d at 1331 (alteration in original) (quoting *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983)); *See also Terrell v. Brewer*, 925 F.2d 1015, 1017 (9th Cir. 1991) (holding that neither factor is dispositive and both must be evaluated together).

This is not an extraordinary case that warrants the appointment of counsel. The Court will grant summary judgment for both the IDOC and medical defendants. Thus, there is no likelihood of success on the merits.

Piro has been very capable in articulating his claims. He has filed multiple motions, which included legal citations and supporting declarations. Further he has vigorously pursued discovery from the Defendants, including serving interrogatories and requests for production and filing motions to compel. He has submitted declarations of other inmates in support of his opposition to summary judgment. Finally, he has focused on the core claims at issue in this case and has clearly articulated his arguments in support of his position. Accordingly, Piro's motion for appointment of counsel will be denied.

## 2.  Medical Expert

The *in forma pauperis* statute, 28 U.S.C. § 1915, does not authorize federal courts to appoint or authorize payment for expert witnesses for prisoners or other indigent litigants. Ordinarily, the plaintiff must bear the costs of his litigation, including expert expenses, even in *pro se* cases. *See Pedraza v. Jones*, 71 F.2d 194, 196 (5th Cir.1995); *Malik v. La Valley*, 994 F.2d 90 (2d Cir.1993); *Boring v. Kozakiewicz*, 833 F.2d 468, 474 (3d Cir.1987) (noting that an inmate's dilemma in being unable to proceed with suit because of inability to pay for expert witnesses was no different than that of non-prisoner claimants who face similar problems).

Pursuant to Federal Rule of Evidence 706, a federal court may appoint an independent expert witness and allocate the expert's fees among the parties "in such proportion and at such time as the court directs." Fed.R.Evid. 706(b). Under this rule, experts are properly appointed where complex scientific issues are involved, such as determining what the concentration levels of environmental tobacco smoke (ETS) are in a prison and determining the health effects of ETS on nonsmoking prisoners. *McKinney v. Anderson*, 924 F.2d 1500 (9th Cir.1991), vacated on other grounds by *Heiling v. McKinney*, 502 U.S. 903 (1991). However, courts have recognized that Rule 706 does not contemplate the appointment of, and compensation for, an expert to aide one of the parties. *See, e.g., Gamez v.*

*Gonzalez*, 2010 WL 2228427, * 1 (E.D. Cal. June 3, 2010). In other words, the principal purpose of a court-appointed expert is to assist the trier of fact from a position of neutrality, not to serve as an advocate.

Piro's motion for appointment of an expert will be denied for two reasons. First, Piro's request was filed after the discovery cutoff deadline and is therefore untimely. Second, Piro urges that he needs an expert to serve as an advocate for him. However, that is not the purpose of a Court appointed expert witness. Here, the issue is whether Defendants were deliberately indifferent to Plaintiff's injuries resulting from the assault, in particular the treatment of his facial fractures and pain management. The issue of deliberate indifference regarding these medical issues is not so complicated and difficult that an expert is required. Accordingly, the Court will deny Piro's motion to appoint an expert witness.

### C.   Motion for Summary Judgment

#### 1.  IDOC Defendants

The IDOC Defendants move for summary judgment on all of Piro's claims arguing they fail on the merits. *Def.'s Mem.* at 2, Dkt. 51-1. IDOC defendants further argue they are entitled to qualified immunity,[20] and that Piro failed to

---

[20] For the reasons discussed below the Court has determined that the IDOC defendants (Continued)

exhaust his administrative remedies. *Id.*

Piro failed to exhaust his administrative remedies under the PLRA as to Carlin, McKay, Martinez, and Howard. On March 8, 2017, Piro filed a grievance with IDOC relating to the assault by Pasquini. *See* Dkt. 28 at 10. The only defendants named in that grievance were Drake and Hale. *Id.* Piro also filed a grievance on March 26, 2018 which named Warden Blades and Carlin. Dkt. 28 at 14. This grievance primarily related to Piro being released from protective custody in the future, not to the February 2017 assault. *Id.*

IDOC policy requires that grievance forms be submitted within 30 days of the incident. *Young Dec.* ¶ 6, Dkt. 51-60. Therefore the 2018 grievance does not exhaust Piro's claim. IDOC policy also requires that grievances contain specific information including the nature of the complaint, dates, places, and names of individuals. *Id.* ¶ 7; *Savage v. Gelok*, No. 1:16-cv-00073-BLW, 2016 WL 6963031, at *7 n.3 (D. Idaho Nov. 28, 2016). Piro only named Hale and Drake in his 2017 grievance. Further, his allegations were not specific enough to put IDOC on notice that the grievance was directed toward other defendants. Therefore, Piro

---

did not violate Piro's constitutional rights. Thus, the Court does not reach the remainder of the qualified immunity analysis – whether the right was clearly established. *See Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066–67 (9th Cir. 2016).

did not grieve any claim against Carlin, McKay, Martinez, or Howard and did not exhausts his remedies under the PLRA.

Even if Piro had exhausted his remedies the Court would still grant summary judgment for the IDOC defendants on the merits.

### a. Defendant Carlin[21]

Piro asserts that Carlin failed to protect him by transferring him to close custody placement, and by failing to place him in protective custody at ICIO. *Compl.* at 22, Dkt. 3. Piro also claimed, during his deposition and in response to IDOC Defendants' motion, that Carlin thwarted his effort to obtain protective custody after he was transferred out of ICIO, however this claim was not in his complaint. *See Piro Depo.* at 170. Piro asserts that Carlin's actions resulted in the February 2016 assault. *Id.*

There is no evidence in the record to support Piro's claim that Carlin was deliberately indifferent to a serious risk. In the concern forms Piro sent to Carlin he only raised general concerns about the risk he may face from actions occurring in 2004 and his sex offender status. In his request for protective custody, which

---

[21] Carlin filed a motion to dismiss (Dkt. 25) arguing that Piro's claim of failure to protect was barred by the two-year statute of limitations. Because the Court will grant IDOC Defendants' motion for summary judgment, which includes Piro's claims as to Carlin, the Court finds that Carlin's motion to dismiss is moot.

**MEMORANDUM DECISION AND ORDER - 44**

Carlin forwarded to ISCC, Piro identified an offender then housed at ICIO—not ISCC where Piro was being sent—and "gang members everywhere at IDOC." *Piro Depo. Ex. 9*, Dkt. 51-13. Piro's assertions of risk are of a general and unsubstantiated, and not sufficient to put Carlin on notice of a substantial risk of harm. *See Crofts v. Wessels*, No. 1:17-CV-00058-DCN, 2019 WL 1431225, at *3 (D. Idaho Mar. 29, 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Further, even if Piro's statements to Carlin were sufficient to notify her of a substantial risk at ISCC, Piro was not attacked at ISCC, where he was transferred by Carlin. Instead he was attacked at IMSI. Carlin had no involvement in Piro's placement at IMSI and could not have been aware of any risk to him there. Thus, Carlin's actions were neither the actual nor proximate cause of Piro's injuries. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013). Accordingly, the IDOC Defendants' motion will be granted as to Carlin.

### b.  Defendants McKay, Martinez

Piro argues that Defendant McKay was deliberately indifferent by failing to recommend protective custody following the 2016 RHPC hearing. McKay was the Chair of the RHPC which held a hearing on, and denied, Piro's protective custody request. At the hearing Piro raised only general concerns about risks arising from his underlying conviction and his status as a sex offender. There is simply nothing

in the record showing that McKay was aware of a substantial risk to Piro nor that McKay disregarded any risk. Instead the RHPC unanimously recommended Piro be placed in the general population.

Piro argues that Martinez was deliberately indifferent when Martinez ordered Piro to move out of segregation and then ordered a use of force to move Piro. Martinez directed Piro to move from segregation to the general population at ISCC. Piro refused to move and asserts that he told Martinez he feared for his life because IDOC officers in the past had threatened him and because he was a sex offender. *Piro Depo.* at 101-02. Martinez ordered the use of force to move Piro but had no other contact with him. Martinez's brief interaction with Piro, and Piro's general statements of risk were not sufficient to make Martinez aware of a substantial and serious risk to Piro.

Further, both McKay and Martinez were officers at ISCC. Piro was moved to IMSI on September 1, 2016 and was safely housed there for five months prior to the assault. Even if McKay and Martinez may have been aware of a risk to Piro, their actions were neither the actual nor proximate cause of the assault on Piro. *See Lemire.*, 726 F.3d at 1074. Accordingly, Defendants motion will be granted as to McKay and Martinez.

**MEMORANDUM DECISION AND ORDER - 46**

### c. Defendant Howard

Piro argues that Defendant Howard's failure to place Piro in alternative housing was deliberatively indifferent. Defendant Howard met with Piro in September 2016 when Piro was moved to Tier A-2 at IMSI. At that meeting Piro expressed concerns about past threats from IDOC officers, his previous attack, and his sex offender status. At the time, Howard was an investigations sergeant for IMSI, responsible for conducting investigations to protect staff and offenders and monitoring STG activity. Tier A-2 was managed as a "softer" tier and over 40 sex offenders had been housed on the tier at various times in the year before the assault on Piro. Only two of those sex offenders had been attacked on the tier. Piro did not request protective custody at his meeting with Howard. Piro was safely housed on Tier A-2 for five months after his meeting with Howard. There is nothing in the record to show that Howard was aware of a substantial risk to Piro. Further, Piro's meeting with Howard was five months prior to his assault, and there is no evidence that Howard acted unreasonably in his involvement with Piro's placement on Tier A-2.

By the time inmate Pasquini was moved to Tier A-2, Howard was the Unit Supervisor for A Block. Howard reviewed Pasquini's IDOC file, which contained no information showing that that Pasquini was a safety concern. *Howard Dec.* ¶ 9,

Dkt. 51-42. There is nothing in the record to demonstrate that Howard was deliberately indifferent to a serious risk to Piro.

Accordingly, the IDOC Defendants' motion as to Howard will be granted.

### d.   Defendants Drake and Hale

Piro argues that Defendants Drake and Hale were both aware of a serious risk of harm to him and were deliberately indifferent by failing to place him in protective segregation and investigate the threats against him. At the February 3 meeting with Drake and Hale, Hale asked Piro how he would feel as a sex offender moving to a block with inmates who had dropped out of gangs. Piro argues that he told Hale there were gang dropouts on Tier A-2. Piro argues that he told both defendants that he was "getting threats that [he was] going to get smashed out right now." *Resp.* at 25, Dkt. 66-2; *Piro Depo.* at 120-21. Piro also stated in his deposition that he had been hearing threats through vents in his cell.

This is not a situation where Piro communicated a specific threat or where, under the circumstances, the threat was obvious. *See Wilk v. Neven*, No. 17-17355, --- F.3d ---, 2020 WL 1949281, at *4 (9th Cir. Apr. 23, 2020) (reversing summary judgment for prison staff where plaintiff was assaulted after telling prison staff another inmate had threatened to kill him and prison staff moved plaintiff back to general population where inmate had access to plaintiff); *Cortez v. Skol*, 776 F.3d

1046, 1049 (9th Cir. 2015). Instead, Piro communicated a general nonspecific threat with no context or support.

Drake had met with Piro in September and he had raised general concerns about his status as a sex offender and his past conviction. The record shows that Piro had been successfully and safely housed on Tier A-2 for five months. Other sex offenders were housed on Tier A-2 and there is nothing in the record to indicate that there was a high rate of attacks on those sex offenders which may have made the risk obvious. Piro requested the meeting with Hale to discuss a possible move to E and G Block.

Further, Drake did not become aware of the message from Piro's cellmate's mother regarding concerns about the safety of her son or Piro until after the meeting. Piro did not tell Drake or Hale about the threats he had been hearing through the vents in his cell. Piro did not request protective custody at the meeting nor did he resist returning to Tier-A2 following the meeting. Taken in context of the record, Piro's statement that he was receiving threats that he was going to get smashed out "right now" is not sufficient to make Drake or Hale subjectively aware of a serious threat.

Both Drake and Hale state that they did not ask follow-up questions because they did not actually understand Piro to be claiming he was facing a specific threat.

Instead Hale states that he believed Piro was trying to bolster his case to move to the E and G Block. Drake states that she understood Piro to be raising the same general concerns he had expressed in September.

The Supreme Court has made clear: "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). Here, the record taken as a whole could not lead a rational trier of fact to find that defendants Drake or Hale were deliberately indifferent to, let alone aware of, a serious risk to Piro. Accordingly, the IDOC Defendants' motion will be granted as to Drake and Hale.

### 2. Medical Defendants

The Medical Defendants move for summary judgment on all of Piro's claims against them. *Def.'s Mot.*, Dkt. 54. Defendants argue that summary judgment is appropriate because the medical treatment Piro received after the assault was appropriate and rendered without delay. *Def.'s Mem.* at 2, Dkt. 54-12. Piro argues that the Medical Defendants were deliberately indifferent by failing to provide him with pain medication and unnecessarily delaying offsite treatment for his facial fractures.

### a.  Pain Medication

Piro alleges that Defendants Valley, Armstrong, and Cooper, failed to provide him with adequate pain medication for injuries resulting from the February 3, 2017 assault. Piro argues that, while pain medication may have been prescribed, it was never actually provided to him. There is simply no evidence in the record to support Piro's claim. Instead the record is replete with evidence that Piro was prescribed pain medication on multiple occasions and he either received the medication or refused it.

Further, Defendants' medical expert Dr. Carey states that patients who suffer facial fractures, like Piro's, suffer from minimal pain. *Carey Dec.*, Dkt. 54-5. Dr. Carey states that Tylenol and Ibuprofen are entirely appropriate for pain management of facial fractures.

The evidence in the record clearly shows that Defendants' provision of pain medication to Piro was entirely appropriate. Accordingly, the motion will be granted on this claim.

### b.  Delayed Surgery

Piro alleges that John Doe Defendants, along with Defendants Valley, Tuckett, and Pierson, were deliberately indifferent by delaying diagnoses of, and offsite surgery for, Piro's facial fractures.

Piro was assaulted on February 3, 2017. Armstrong did not suspect a facial fracture when he first examined Piro. The HSRs Piro submitted on February 3 and February 5 focused on the injuries to his back and ear, but not his face. On February 5, Cooper noticed a lump on Piro's face and scheduled him for an appointment with Valley. Defendant Valley examined Piro on February 9 and ordered an x-ray of his face. Valley reviewed the x-ray with Piro on February 16. On February 21 Piro had a preoperative appointment with Dr. Anderson. On February 22 Dr. Anderson performed corrective surgery. Dr. Anderson noted that there was some healing, an osteoid formation, and some challenge reducing the fracture due to its age. However, in every follow-up visit Dr. Anderson indicated that the surgery was successful and Piro was healing well.

Defendants' expert, Dr. Carey states that a 19-day delay is not a significant delay for this surgery. Dr. Carey further states that all prison medical staff provided Piro with appropriate and timely medical care within reasonable medical guidelines.

The record demonstrates that Defendants' treatment of Piro was entirely appropriate. Defendants were responsive to Piro's multiple HSRs and did not delay scheduling him for an x-ray and surgery. Accordingly, Defendants' motion will be granted as to this claim.

### D.   Motion for Leave to File Amended Complaint

Piro filed two identical Motions for Leave to File an Amended Complaint In the Event the Court Intends to Dismiss Plaintiffs Case in its Entirety. Dkt. 91, 93. Piro did not file a proposed amended complaint. Piro only seeks leave to amend in the case the Court grants the Defendant's motions for summary judgment and dismiss the case. *Id.*

Federal Rule of Civil Procedure 15(a) provides that, once a responsive pleading has been served, a party may amend its pleading "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave need not be granted, however, where the amendment "would cause the opposing party undue prejudice, is sought in bad faith, constitutes an exercise in futility, or creates undue delay." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The final factor—undue delay—weighs against allowing Piro to amend. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (affirming the district court's denial of a motion for leave to amend filed five days before the close of discovery where the additional claims would have required additional discovery, delaying proceedings and prejudicing defendants). Here, Piro did not

move to amend his complaint until all deadlines in the discovery order had passed, discovery had closed, and Defendants' motions for summary judgment were fully briefed. Piro has provided no justification for his failure to make such a motion in a timely manner.

More importantly, granting leave to amend would be an "exercise in futility." As the Court just explained, Piro cannot succeed on his Eighth Amendment claims, and there is nothing in the record to indicate that adding any defendants or claims would cure this. Accordingly, the motions for leave to amend will be denied.

## ORDER

**IT IS HEREBY ORDERED AS FOLLOWS:**

1. Plaintiff's Motion for Leave to Move for an Order to Compel Discovery (Dkt. 39) is **DENIED as MOOT.**

2. Plaintiff's Motion to Compel (Dkt. 40) and Motion to Reopen Discovery (Dkt. 83) are **DENIED.**

3. Plaintiff's Motion for Appointment of Counsel and Medical Expert Witness (Dkt. 47) is **DENIED.**

4. Plaintiff's Request for Pro Se/Pro Bono Information Concerning E-Filing Procedures and Rules (Dkt. 52) is **DENIED as MOOT.**

5. Plaintiff's Motion Requesting the Court Take Notice of Plaintiff's Deposition Testimony (Dkt. 86) is **DENIED as MOOT.**

6. Defendants' Motions for Summary Judgment (Dkt. 51, 54) are **GRANTED.**

7. Defendant's Motion to Dismiss (Dkt. 25) is **DENIED as MOOT.**

8. Plaintiff's Motions for Leave to File an Amended Complaint (Dkt. 91, 93) are **DENIED**.

DATED: April 28, 2020

B. Lynn Winmill
U.S. District Court Judge